# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| AARON HUNTER, | ) No. CV 17-6006-PLA |
| Plaintiff, | ) **MEMORANDUM OPINION AND ORDER** |
| v. | ) |
| NANCY BERRYHILL, DEPUTY COMMISSIONER OF OPERATIONS FOR THE SOCIAL SECURITY ADMINISTRATION, | ) |
| Defendant. | ) |

## I.

## <u>PROCEEDINGS</u>

Plaintiff filed this action on August 14, 2017, seeking review of the Commissioner's[1] denial of his application for Disability Insurance Benefits ("DIB"). The parties filed Consents to proceed before a Magistrate Judge on September 1, 2017, and September 14, 2017. Pursuant to the

---

[1] On March 6, 2018, the Government Accountability Office stated that as of November 17, 2017, Nancy Berryhill's status as Acting Commissioner violated the Federal Vacancies Reform Act (5 U.S.C. § 3346(a)(1)), which limits the time a position can be filled by an acting official. As of that date, therefore, she was not authorized to continue serving using the title of Acting Commissioner. As of November 17, 2017, Berryhill has been leading the agency from her position of record, Deputy Commissioner of Operations.

Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on May 14, 2018, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born on October 30, 1986. [Administrative Record ("AR") at 32, 140.] He has past relevant work experience as a delivery driver, shoe salesperson, retail sales clerk, baker helper, retail store manager, and a material handler. [AR at 32, 65-66.]

On July 23, 2014, plaintiff filed an application for a period of disability and DIB alleging that he has been unable to work since December 1, 2010. [AR at 140-41.] After his application was denied initially, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 93.] A hearing was held on February 24, 2016, at which time plaintiff appeared represented by an attorney, and testified on his own behalf. [AR at 39-72.] A vocational expert ("VE") also testified. [AR at 65-70.] On April 25, 2016, the ALJ issued a decision concluding that plaintiff was not under a disability from December 1, 2010, the alleged onset date, through December 31, 2015, the date last insured. [AR at 25-34.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 138-39.] When the Appeals Council denied plaintiff's request for review on June 21, 2017 [AR at 1-6], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Id. (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsburry,

468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2.  Lounsbury, 468 F.3d at 1114.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.      THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since December 1, 2010, the alleged onset date, through December 31, 2015, the date last insured.[2] [AR at 27.]  At step two, the ALJ concluded that plaintiff has the severe impairment of "disorders

---

[2]     The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2015.  [AR at 27.]

of the back post injury." [Id.]  The ALJ also determined that plaintiff's medically determinable impairment of a "mood disorder" was nonsevere.  [Id.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing.  [AR at 28.]  The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. § 404.1567(b),[4] "except for any work involving more than occasional climbing, balancing, stooping, crouching or crawling."  Additionally, "[he] must be allowed the option to shift position from sitting to standing while remaining on task."  [Id.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform any of his past relevant work as a delivery driver, shoe salesperson, retail sales clerk, baker helper, retail store manager, and material handler.  [AR at 32, 66-68.]  At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "fundraiser" (Dictionary of Occupational Titles ("DOT") No. 293.357-014), as a "survey worker" (DOT No. 205.367-054), and as an "information clerk" (DOT No. 237.367-018).  [AR at 33, 67-68.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of December 1, 2010, through December 31, 2015, the date last insured.  [AR at 33-34.]

/

---

[3]  RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

# V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he: (1) rejected the opinion of the Agreed Medical Examiner ("AME"), Julie Armstrong, R.N., Psy.D., in determining that plaintiff did not have a severe mental impairment; and (2) rejected plaintiff's subjective symptom testimony. [JS at 4.] As set forth below, the Court agrees with plaintiff and remands for further proceedings.

## A.    THE ALJ'S STEP TWO FINDING

### 1.    Legal Standard

At step two of the five-step process, plaintiff has the burden to provide evidence of a medically determinable physical or mental impairment that is severe and that has lasted or can be expected to last for a continuous period of at least twelve months. Ukolov v. Barnhart, 420 F.3d 1002, 1004-05 (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D)); see 20 C.F.R. §§ 404.1508 (effective through March 26, 2017), 404.1509, 404.1520(a)(4)(ii); see generally Bowen v. Yuckert, 482 U.S. 137, 148, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (Secretary may deny Social Security disability benefits at step two if claimant does not present evidence of a "medically severe impairment"). This must be "established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508 (effective through March 26, 2017). The Commissioner's regulations define "symptoms" as a claimant's own description of her physical or mental impairment. 20 C.F.R. § 404.1528 (effective through March 26, 2017). "Signs," by contrast, "are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements . . . [,] [and] must be shown by medically acceptable clinical diagnostic techniques." Id. Finally, "[l]aboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." Id. A claimant's statements about an impairment (i.e., "symptoms") "are not enough [by themselves] to establish that there is a physical or mental impairment." Id.

Step two is "a de minimis screening device [used] to dispose of groundless claims."

Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). A "severe" impairment, or combination of impairments, is defined as one that significantly limits physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520. An impairment or combination of impairments should be found to be "non-severe" only when the evidence establishes merely a slight abnormality that has no more than a minimal effect on an individual's physical or mental ability to do basic work activities. Yuckert, 482 U.S. at 153-54 & n.11 (Social Security claimants must make "de minimis" showing that impairment interferes with ability to engage in basic work activities) (citations omitted); Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005); see also 20 C.F.R. § 404.1521(a). "Basic work activities" mean the abilities and aptitudes necessary to do most jobs, including "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . ." 20 C.F.R. § 404.1521(b). It also includes mental functions such as the ability to understand, carry out, and remember simple instructions, deal with changes in a routine work setting, use judgment, and respond appropriately to supervisors, coworkers, and usual work situations. See Soc. Sec. Ruling ("SSR")[5] 85-28.

When reviewing an ALJ's findings at step two, the Court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." Webb, 433 F.3d at 687 (citing Yuckert, 841 F.2d at 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.")).

In this case, the ALJ determined that plaintiff's "mood disorder" was nonsevere as he had "no more than mild mental limitations in his ability to perform activities of daily living, to engage in social functioning, and to perform activities requiring concentration, persistence or pace." [AR at 27-28.]

---

[5] "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

## 2. Analysis

On September 7, 2012, AME Dr. Armstrong completed an Agreed Medical Re-Examination of plaintiff in connection with his workers' compensation case.[6] [AR at 349-82.] Plaintiff presented at the examination with "low back pain, severe headaches, ruminative thinking, insomnia, irritable mood, and low libido." [AR at 351.] He also reported difficulty paying attention, feelings of being overwhelmed, easy distractibility, difficulty concentrating, memory problems, and loss of appetite. [AR at 352.] Dr. Armstrong stated that she reviewed "approximately 6 inches" of medical and legal records, conducted a 1.5 hour face-to-face psychological interview, and administered a number of psychological tests, including the Beck Depression Inventory, Beck Anxiety Inventory, Epworth Sleepiness Scale, Wahler Physical Symptoms Inventory, and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). [AR at 351.] She also conducted a mental status examination. Among the records Dr. Armstrong stated she reviewed were the following:

- A comprehensive medical-legal report by psychiatrist Jerome H. Franklin, M.D., on July 16, 2012;
- Progress notes prepared by William W. Deardorff, Ph.D., plaintiff's psychotherapist and pain program provider, on October 1, 2011, January 17, 2012, January 31, 2012, February 21, 2012, April 17, 2012, May 8, 2012, May 22, 2012, and July 3, 2012;
- Orthopedic Agreed Medical Examination and Supplemental Reports prepared by William H. Mouradian, M.D., on March 12, 2012, and April 18, 2012;
- Progress reports prepared by plaintiff's treating physician, Mark Ganjianpour, M.D., from May 4, 2011, through December 28, 2011, and February 9, 2012, through June 21, 2012; and
- Progress reports prepared by plaintiff's treating internal medicine physician, Randall Calderon, M.D., on July 7, 2011, August 4, 2011, September 1, 2011, November 21, 2011, and December 22, 2011.

---

[6] In addition to an initial examination on November 2, 2011 [see AR at 349], Dr. Armstrong also re-evaluated plaintiff on March 26, 2012. [AR at 301-48.]

[AR at 352-57.]

Dr. Armstrong's clinical testing placed plaintiff in the severe range of subjective depression and the severe range of subjective anxiety; reflected that he experiences somatic symptoms "at a rate exceeding 90% of the normal population"; and placed him in the abnormal range on the Epworth Sleepiness Scale. [AR at 372-73.] The MMPI-2 results showed some response inconsistency, which may have been due to "a scattering of random or arbitrary" responses or limitations in plaintiff's ability to fully understand the items; he also "provided many atypical and rarely given responses," perhaps due to his feeling distracted, or due to "disorganizing pathology, carelessness, or errors in entering his responses on the answer sheet." [AR at 373.] Additionally, his "extreme elevation [on] one of the alternate validity scales indicate[s] his response to be an exaggeration of symptoms or in this case a 'cry for help.'" [Id.] She nevertheless found that the testing showed "no evidence of any attempts to consciously distort the test results in a self-favorable direction." [AR at 376.] Dr. Armstrong diagnosed plaintiff with pain disorder due to psychological factors and general medical condition; major depressive disorder, single episode, moderate, with an onset of June 2011, "resolving"; and resolved post-traumatic stress disorder. [AR at 374.] She noted that he had narcissistic, histrionic, and dependent personality traits; and had the physical conditions of "[d]isc herniations: 5 mm at L4-5 and 2-3 mm L5-S1"; lumbar radiculopathy; and a history of gastritis. [Id.] She assessed a Global Assessment of Functioning ("GAF")[7] score of 61, indicative of "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV 34. Dr. Armstrong noted that since her March 2012 evaluation, when some of plaintiff's depression symptoms appeared worse, he has "received a

_____

[7] A GAF score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV"). The most recent edition of the DSM "dropped" the GAF scale, citing its "conceptual lack of clarity" and "questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

good course of psychiatric and psychological treatment," with Dr. Deardorff, and then Dr. Franklin, and his "symptoms have improved considerably since his last appointment." [AR at 375.] She noted that although plaintiff continues to have symptoms consistent with major depression and with a pain disorder, his depression symptoms are resolving "and he is learning to live with and adapt to his current level of pain. He has become more social and more active despite his subjective complaints." [Id.] She determined that his symptoms overall "are at the low end of the mild range" and, although he will need some ongoing treatment, "for all intents and purposes, his condition has reached a state of maximum medical improvement." [Id.] She opined that, "[w]ith regard to the *AMA Guides*, Fifth Edition, [plaintiff's] permanent psychological impairment is rated as follows:"

- There is mild-to-moderate impairment in activities of daily living, based on [plaintiff's] history of reduced sex drive and his current sleep disturbances of moderate proportions.

- There is mild impairment in social functioning, based on residual depressive and anxiety symptoms, along with a history of social isolation, poor libido and fears about how [he] is perceived.

- There is mild-to-moderate impairment in concentration, based on subjective description, tempered by objective findings in the mildly impaired range.

- There is mild impairment in adaptation to stressful circumstances, as a result of residual depressive symptoms, anxiety, and subjective concentration disturbance. The MMPI-2 result supports this opinion, as it finds [plaintiff's] overall ego strength, as slightly below the expected level, suggesting that he has a compromised set of internal psychological resources.

[AR at 378-79.] She concluded the following:

From a purely psychological standpoint, [plaintiff] is not capable of performing his usual and customary duties [as a furniture technician]. His pain and attempts to avoid movement that could cause pain create[] [a] distraction for him; this could be dangerous when attempting to move large merchandise in and out of the truck, up and down the curb [or] stairs, and in and out of people's homes. As such, [plaintiff] is a qualified injured worker on a psychological basis.

[AR at 381; see also AR at 350.]

The ALJ generally noted that the record contained numerous reports generated in connection with plaintiff's workers' compensation litigation. [AR at 29.] In that regard, he stated the following:

> It is emphasized that the criteria used in these medical-legal reports is not the same as that used in determining disability under the Social Security Act and Regulations. Moreover, the purpose of these reports is usually to establish causation and apportionment (which are not relevant to the determination of disability under Social Security guidelines). Thus, the conclusions, observations and findings made in such reports are often of limited value. Nor is the Social Security Administration bound by any determinations of disability made under the workers compensation system.

[AR at 29.] The ALJ then summarized Dr. Armstrong's March 26, 2012, and September 7, 2012, examinations. [AR at 30-31.] He noted that the March 26, 2012, examination reflected plaintiff's described symptoms of constant low back pain, headaches with blurred vision, stomach pain, insomnia, waking up in a cold sweat every night, nightmares, neck pain, shoulder pain, various depressive symptoms, and difficulty with attention and concentration. [AR at 30.] At that examination, Dr. Armstrong stated that plaintiff's diagnoses were pain disorder associated with both psychological factors and a general medical condition; major depressive disorder, single episode, moderate; a resolved post-traumatic stress disorder; narcissistic, histrionic, and dependent personality traits; and a GAF score of 56, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV 34.

With respect to the September 2012, examination report, the ALJ observed that Dr. Armstrong stated that plaintiff's "symptoms had considerably improved since his last appointment," and that "[o]verall, it was felt [plaintiff's] 'symptoms are at the low end of the mild range.' However, Dr. Armstrong stated [plaintiff] was not capable of returning to his past work from a psychological standpoint." [AR at 30-31 (citing AR at 375, 381).] The ALJ did not otherwise state any specific reason for not giving any weight to Dr. Armstrong's opinions. The ALJ also mentioned the July 2011 through May 2012 records from workers' compensation psychologist William Deardorff, Ph.D., and the July 2012 through October 2012 records from workers' compensation psychiatrist Jerome Franklin, M.D. [AR at 31 (citations omitted).] With respect to Dr. Deardorff's notes, the ALJ merely referenced his diagnosis of chronic pain syndrome. [Id. (citing generally AR at 383-418).] He did not mention any of Dr. Deardorff's mental health findings (as reported by Dr.

Armstrong), e.g., plaintiff showed a classic kinesiophobia syndrome; re-evaluation by the agreed medical examiner for a psychiatric permanent and stationary rating was suggested; plaintiff was socially isolated, and showing increasing signs of depression and feelings of less self-efficacy; strongly recommending MMPI-2 testing; noting worsening pain and depression; noting that plaintiff was showing "more signs of an agitated depression"; and noting a worsening depression due to a lack of progress with his pain program. [AR at 353-54.] Similarly, with respect to Dr. Franklin's records, the ALJ noted that Dr. Franklin had diagnosed plaintiff with a "depressive disorder not otherwise specified versus a major depressive disorder, single episode," and gave him a "guarded prognosis"; and in October 2012, Dr. Franklin noted that plaintiff's "depression had responded to psychotherapy and medications *to some degree*, and that he had been filing multiple applications in an attempt to find work."[8] [AR at 31 (citing AR at 562, 572) (emphasis added); see also AR at 352, 535-74.]

The ALJ instead gave "great weight" to the October 10, 2014, report of the psychiatric consultative examiner Ernest A. Bagner III, M.D., who found "no evidence of a psychiatric impairment or any mental work-related limitations." [AR at 32 (citing AR at 500-04).] The ALJ also stated that "this was also the conclusion of the State Agency medical consultant." [AR at 32 (citing AR at 73-86).]

Plaintiff argues that "aside from noting that Armstrong's opinion was made in the context of workers' compensation, the ALJ made no effort to consider restrictions found by Dr. Armstrong resulting from [plaintiff's] mental condition." [JS at 9.] Plaintiff also contends that the ALJ erred

---

[8]    To the extent, if any, the ALJ is implying that plaintiff's search for work is a reason to discount Dr. Armstrong's opinions about plaintiff's mental health or other limitations, this reason is unpersuasive. The fact that plaintiff looked for work during the period of alleged disability is not a sufficient reason to discount a treating provider's opinion, in the absence of some evidence suggesting plaintiff was pursuing full-time work. See Knight v. Colvin, 2017 WL 89573, at *10 (D. Or. Jan. 10, 2017) (citing Mulanex v. Comm'r of Soc. Sec., 293 F. App'x 522, 523 (9th Cir. 2008) (explaining that eligibility for Social Security disability benefits is predicated on an inability to sustain full-time work, not part-time work, which is why the receipt of unemployment benefits is not necessarily inconsistent with the filing of a disability application)). There is no evidence here of whether plaintiff was looking for full-time or part-time work, or even what kind of work he was applying for and, in any case, without more, plaintiff's willingness to look for a job is not a specific and legitimate reason to discount Dr. Armstrong's opinion.

because he failed to "translate" Dr. Armstrong's workers' compensation findings of mild to moderate impairments in functioning to social security disability terminology. [JS at 9-10.] He submits that the publication relied on by Dr. Armstrong -- the *AMA Guides*, Fifth Edition -- specifically provides that a mild impairment represents a 1-15% level of impairment, and a moderate impairment represents a 16-25% level of impairment. [JS at 10 & n.3 (citing *AMA Guides to the Evaluation of Permanent Impairments*, Fifth Ed., Table 14-1).] Therefore, according to plaintiff, if the ALJ had properly "translated" Dr. Armstrong's findings, that would mean plaintiff has a permanent impairment of between 1% and 25% in activities of daily living; between 1% and 15% in social functioning; between 1% and 25% in concentration; and between 1% and 15% in adapting to stressful circumstances. [JS at 10-11.] He submits that even discounting the limitations in social functioning and adapting to stressful circumstances, which "can reasonably be argued . . . [to] refer to a one percent impairment," Dr. Armstrong's opinion with respect to activities of daily living and concentration still represents *at least* a 15% level of impairment, and possibly up to 25% level of impairment, thereby indicating a more than minimal impact on plaintiff's ability to work. [JS at 11 (citing <u>Meza v. Colvin</u>, 2016 WL 7479321, at *5 (C.D. Cal. Dec. 29, 2016)).] Plaintiff thus contends that the ALJ failed to properly consider Dr. Armstrong's opinion, and simply discounted it "by characterizing it as representing the low end of mild impairment without consideration to the actual limitations found in the report." [<u>Id.</u> (citations omitted).]

Plaintiff also argues that Dr. Bagner's report is of limited value because he "did not find the presence of a medically determinable mental impairment," and he conducted only a single mental status examination in connection with his report. [JS at 11 (citing AR at 500-04).] Additionally, he states that Dr. Bagner did not review a single medical record and, therefore, erroneously found that plaintiff's history reflected no past psychiatric treatment. [JS at 11-12 (citing AR at 500-04).] Accordingly, plaintiff contends that the ALJ improperly gave "great weight" to Dr. Bagner's report and that this error was not harmless because if the ALJ had included Dr. Armstrong's impairments in concentration and activities of daily living in his hypothetical to the VE, the VE testimony may have been different. [JS at 12 (citation omitted).]

Defendant argues that the mere diagnosis of an impairment is not enough to prove disability

and suggests that plaintiff failed to prove that he had a severe mental impairment.  [JS at 13-14 (citations omitted).]  Defendant also submits that the evidence in the record does not support a finding that plaintiff has a severe mental impairment, while "the opinions of two physicians, Dr. Bagner and Dr. Gold [the state agency medical consultant], support the ALJ's finding of nonseverity."  [JS at 14 (citations omitted).]  Defendant suggests that the ALJ properly afforded significant weight to Dr. Bagner and the state agency medical consultant (who reviewed medical evidence in the record), over plaintiff's physician, Dr. Armstrong.  [JS at 15-16 (citations omitted).]  She states that Dr. Armstrong's opinion "was the only medical opinion that suggested such severe mental limitations."  [JS at 16 (citation omitted).]  Defendant then argues that the ALJ properly gave little weight to Dr. Armstrong's opinions for the following reasons:  (1) Dr. Armstrong's report was generated in connection with plaintiff's workers' compensation litigation, which applies different standards for disability from the Social Security Administration, and whose purpose is not relevant to disability determination under the Social Security Act; (2) "[g]iven the mild objective findings found in Plaintiff's record and the minimal treatment post-2013, the ALJ reasonably gave Dr. Armstrong's opinion little weight and reasonably found that Plaintiff did not have a severe mental impairment"; and (3) Dr. Armstrong's opinions conflicted with her own notes and findings.[9] [JS at 15-17.]

### a.    Workers' Compensation Records

An ALJ "may not disregard a . . . medical opinion simply because it was initially elicited in a state workers' compensation proceeding . . . ."  <u>Booth v. Barnhart</u>, 181 F. Supp. 2d 1099, 1105

---

[9]    Defendant's second and third "reasons" for finding  that the ALJ properly gave Dr. Armstrong's opinion little weight, are not reasons given by the ALJ for discounting Dr. Armstrong's opinions.  "Long-standing principles of administrative law require [this Court] to review the ALJ's decision based on the reasoning and factual findings offered *by the ALJ* -- not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."  <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (emphasis added, citation omitted); <u>Pinto v. Massanari</u>, 249 F.3d 840, 847 (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision.").  The Court will not consider reasons for rejecting Dr. Armstrong's opinions that were not given by the ALJ in the decision.  See <u>Trevizo v. Berryhill</u>, 871 F.3d 664, 677 & nn. 2, 4 (9th Cir. 2017) (citation omitted).

(C.D. Cal. 2002). Instead, an ALJ must evaluate the medical records prepared in the context of workers' compensation in the same way he would evaluate records obtained otherwise. Id. (citing Coria v. Heckler, 750 F.2d 245, 248 (3d Cir. 1984)) ("[T]he ALJ should evaluate the objective medical findings set forth in the medical reports for submission with the workers' compensation claim by the same standards that s/he uses to evaluate medical findings in reports made in the first instance for the Social Security claim"). Additionally, the ALJ is obliged to "translate" the workers' compensation findings into the applicable Social Security terminology "in order to accurately assess the implications of those opinions for the Social Security disability determination." Id. (citing Desrosiers v. Sec'y of Health and Human Srvcs., 846 F.2d 573, 576 (9th Cir. 1988)). Although the "translation" need not be explicit, the decision "should at least indicate that the ALJ recognized the differences between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand, and took those differences into account in evaluating the medical evidence." Id. Further, an ALJ is not entitled to reject a medical opinion based "on the purpose for which medical reports are obtained." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1200 n.5 (9th Cir. 2004) (citing Lester, 81 F.3d at 830).

Here, the ALJ did not provide any evidence that Dr. Armstrong -- or any of plaintiff's workers' compensation physicians for that matter -- was anything but an unbiased professional in conducting her examinations and writing her reports. Although the ALJ observed that the workers' compensation and Social Security Administration criteria for disability are different, and that the reports generated in the workers' compensation context are prepared for issues of causation and apportionment, he did not otherwise recognize or discuss the "differences" between Dr. Armstrong's findings of mild to moderate limitations as a result of plaintiff's mental impairments, or "translate" Dr. Armstrong's findings into relevant Social Security terminology. As demonstrated by plaintiff, Dr. Armstrong's explicit reliance on the the *AMA Guides* in making her findings would make such a discussion relatively simple.

Based on the foregoing, this was not a specific and legitimate reason, supported by substantial evidence for discounting Dr. Armstrong's opinions.

### b. Conflicting Evidence in the Record

Although not entirely clear, but giving defendant the benefit of the doubt, the ALJ appears to reject Dr. Armstrong's opinions because they conflict with Dr. Bagner's opinions, as well as with the opinions of the state agency medical examiner.

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.[10] The Ninth Circuit has recently reaffirmed that "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" Trevizo, 871 F.3d at 675 (quoting 20 C.F.R. § 404.1527(c)(2)) (second alteration in original). Thus, "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison, 759 F.3d at 1012 (citing Bray, 554 F.3d at 1221, 1227; Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010)). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008).

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Trevizo, 871 F.3d at 675 (citing Ryan, 528 F.3d at 1198). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. (citing Ryan, 528

---

[10]  The Court notes that for all claims filed on or after March 27, 2017, the Rules in 20 C.F.R. § 404.1520c (not § 404.1527) shall apply. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. Thus, the new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule. See 20 C.F.R. § 404.1520c; see also 81 Fed. Reg. 62560, at 62573-74 (Sept. 9, 2016). However, the claim in the present case was filed before March 27, 2017, and the Court therefore analyzed plaintiff's claim pursuant to the treating source rule set out herein. See also 20 C.F.R. § 404.1527 (the evaluation of opinion evidence for claims filed prior to March 27, 2017).

F.3d at 1198).  When a treating physician's opinion is not controlling, the ALJ should weigh it according to factors such as the nature, extent, and length of the physician-patient working relationship, the frequency of examinations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician.  Trevizo, 871 F.3d at 676; see 20 C.F.R. § 404.1527(c)(2)-(6).  The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).  The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct."  Id.

Although the opinion of a non-examining physician "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray, 554 F.3d at 1221, 1227 (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations).  Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it."  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

Here, the ALJ first summarized some of plaintiff's testimony regarding his pain and ability to take part in certain daily activities, noting the following:  plaintiff "lives independently" (neglecting to mention that at the time of the hearing, and for the two years prior to the hearing, plaintiff was homeless and living in shelters); he does moderate, careful exercising; he reads the Bible for inner strength; he has a driver's license that was suspended due to tickets; he uses public transportation; and he "performs activities of daily living" including preparing "occasional simple meals," going shopping, dressing and bathing independently, and handling his own money.  [AR at 32 (citations omitted).]  After reciting these few findings, the ALJ then conclusorily stated that "the undersigned therefore gives great weight to the psychiatric evaluation by Dr. Bagner, which

found no evidence of a psychiatric impairment or any mental work-related limitations. Notably, this was also the conclusion of the State Agency medical consultant," Dr. Gold. [Id.] This leap of logic between plaintiff's testimony regarding his limited daily activities and Dr. Bagner's findings, without any discussion as to how those activities as described by plaintiff either refute Dr. Armstrong's opinion or support Dr. Bagner's benign findings, is not persuasive.

The ALJ did not provide any discussion setting out a *detailed* and *thorough* summary of the conflicting *clinical* evidence regarding plaintiff's mental health, or state why his interpretations, rather than the interpretations of plaintiff's treating workers' compensation doctors, Dr. Armstrong, Dr. Franklin, and Dr. Deardorff -- all of whom believed plaintiff's mental impairments, whether alone or in combination with his physical impairments, interfered to some extent with his ability to function in a work setting -- were correct. The simple fact that Dr. Bagner's conclusions conflicted with Dr. Armstrong's conclusions, or that the medical examiner agreed with Dr. Bagner, is not in and of itself substantial evidence for rejecting Dr. Armstrong's findings. Indeed, Dr. Bagner did not review *any* of plaintiff's medical records with respect to either his mental *or* physical health. And, Dr. Bagner, who believed that plaintiff was a "fair and reliable historian," also stated that plaintiff had "denied any prior inpatient or outpatient psychiatric treatment." [AR at 501.] Given the fact that plaintiff at the time of Dr. Bagner's examination had been seen on multiple occasions by Dr. Armstrong -- as well as by Dr. Franklin and Dr. Deardorff -- for assessment and treatment of his mental health issues, it seems that plaintiff may not have been as "fair and reliable" a historian with regard to his mental health treatment as Dr. Bagner believed; either that, or plaintiff simply did not equate his sessions with those doctors as constituting "outpatient treatment." In any event, Dr. Bagner's report was based on his one-time mental status examination of plaintiff, while Dr. Armstrong's report was based on her review of all of the medical and psychological/psychiatric records to that date, on her extensive interview of plaintiff, on her prior examinations of plaintiff, and on the multiple psychological tests she administered. Additionally, her report was consistent with the reports of Dr. Franklin and Dr. Deardorff.

In short, this was not a specific and legitimate reason, let alone one supported by substantial evidence, to discount Dr. Armstrong's opinions.

### 3. Conclusion

Under the circumstances here, the ALJ's rejection of Dr. Armstrong's report and his reliance on Dr. Bagner's one-time examination to conclude that plaintiff did not have a medically severe mental health impairment was not supported by substantial evidence.

Remand is warranted on this issue.

## B. SUBJECTIVE SYMPTOM TESTIMONY

Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's subjective symptom testimony. [JS at 18-26.]

The ALJ summarized plaintiff's subjective symptom testimony:

> [Plaintiff] testified he believes he is incapable of working due to severe pain from a low back injury, which occurred while he was lifting a heavy appliance in his past job. His workers compensation case was eventually settled. He admitted he does not need a walker or cane. He was taking muscle relaxants and anti-inflammatory medications, but they were causing stomach problems. He took marijuana for a while, which helped, but he stopped doing this. He is currently living in a shelter. He has tried to look for work, but has been unable to find any light-duty jobs. He collects cans and bottles for money. He went through a seven-month rehabilitation program during workers compensation, and has a goal to go back to work. He was told he did not need surgery, as he was too young. However, he would undergo surgery if necessary. He sometimes has problems using the bathroom, as it is difficult for him to sit. He sometimes wakes up at night due to pain.
>
> . . . .
>
> Both [plaintiff] and his mother indicated on Function Reports in August 2014 that his daily activities were extremely limited due to severe pain and being homeless. However, [plaintiff] indicated he was able to drive a car, prepare occasional simple meals, and go shopping. [He] also told Dr. Bagner in October 2014 that he was able to dress and bathe independently and handle his own money, although it is notable he apparently refused to provide a more detailed description of his daily activities.[11]

---

[11]   Although the ALJ found this "notable," there is no evidence in Dr. Bagner's report that plaintiff *refused* to provide "a more detailed description of his daily activities." [See AR at 501.] Indeed, what Dr. Bagner generally stated was that plaintiff simply "did not describe any of his activities." [AR at 501.] By implication, because plaintiff reported to Dr. Bagner that he can dress and bathe independently, and is able to pay his own bills and handle his own money (generally considered to be activities of daily living), plaintiff simply did not report to Dr. Bagner what types of other activities he engaged in regularly, e.g., shopping, going to church, reading, or going to the movies, to name a few. Neither is there any indication that Dr. Bagner *asked* plaintiff to describe what general activities (besides his ability to perform basic activities of daily living) that he engages

(continued...)

> [Plaintiff] was also notably looking for work in October 2012, and testified that he has looked for work. Additionally, the undersigned observed that [plaintiff] was well groomed and well spoken at the hearing. Although [he] stood up for part of the hearing, he did not use an assistive device for walking. [He] lives independently; does moderate, careful exercising; reads the Bible for inner strength; has a driver's license in suspended status only due to tickets; uses public transportation; and performs activities of daily living.

[AR at 29, 32 (citations omitted).] The ALJ also summarized the medical and psychological record and found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms are "not entirely credible for the reasons explained in this decision." [AR at 29-31.]

On March 28, 2016, shortly before the ALJ's decision in this case, SSR 16-3p went into effect. See SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective symptoms. Id. at *1. SSR 16-3p indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." Id. Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation." Id.; Trevizo, 871 F.3d at 678 n.5. Thus, the adjudicator "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." 2016 WL 1119029, at *10. The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." Id. at *2. The Ninth Circuit in Trevizo noted that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expect to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'" Trevizo,

---

[11](...continued)

in on a regular basis, or that plaintiff simply refused to provide that information for some reason.

871 F.3d at 678 n.5 (citing SSR 16-3p).

To determine the extent to which a claimant's symptom testimony must be credited, the Ninth Circuit has "established a two-step analysis." Trevizo, 871 F.3d at 678 (citing Garrison, 759 F.3d at 1014-15). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. (quoting Garrison, 759 F.3d at 1014-15); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)) (internal quotation marks omitted). If the claimant meets the first test, and the ALJ does not make a "finding of malingering based on affirmative evidence thereof" (Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and determine the extent to which [those] symptoms limit his . . . ability to perform work-related activities . . . ." SSR 16-3p, 2016 WL 1119029, at *4. An ALJ can reject the claimant's testimony about the severity of his symptoms "only by offering specific, clear and convincing reasons for doing so." Trevizo, 871 F.3d at 678 (citing Garrison, 759 F.3d at 1014-15); Treichler, 775 F.3d at 1102. "The clear and convincing standard is the most demanding required in Social Security cases." Trevizo, 871 F.3d at 678 (citing Garrison, 759 F.3d at 1014-15). During this inquiry, the ALJ may consider the objective medical evidence (although this cannot be the sole reason to reject the claimant's statements), and other evidence, including information provided by the claimant's medical sources or non-medical sources about the claimant's pain or other symptoms; daily activities; location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; treatment, other than medication, received for relief of pain or other symptoms; any other measures used by the claimant to relieve pain or other symptoms; and "[o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529 (c)(1)-(3). Then:

> [The ALJ] will evaluate the claimant's statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [he is] disabled. [He] will consider whether there are any inconsistencies in the evidence

and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [his] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]. [His] symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

Id. § 404.1529(c)(4).

Where, as here, plaintiff has presented evidence of an underlying medically determinable impairment, and the ALJ did not make a finding of malingering [see generally AR at 28-32], the ALJ's reasons for rejecting a claimant's subjective symptom testimony must be specific, clear and convincing. Trevizo, 871 F.3d at 678; see also Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)); Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015). "General findings [regarding a claimant's testimony] are insufficient; rather, the ALJ must identify what testimony is [being rejected] and what evidence undermines the claimant's complaints." Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834) (quotation marks omitted). The ALJ's findings "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" Brown-Hunter, 806 F.3d at 493 (quoting Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)). A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Bunnell, 947 F.2d at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

Here, in discounting plaintiff's credibility, the ALJ specifically found the following: (1) plaintiff had not been treated for his back pain or mental health issues since late 2013; (2) the opinions from various workers' compensation orthopedists and other examiners were "somewhat vague and inconclusive, and did not give any permanent limitations or restrictions regarding his spinal condition"; and (3) plaintiff's treatment has been conservative. [AR at 31-32 (citations omitted).]

### 1. Lack of Treatment

The ALJ found it "notable" that plaintiff's workers' compensation case had been settled for $170,000, that plaintiff had spent the settlement funds, and that there was no evidence of treatment for either his physical or mental symptoms since late 2013. [JS at 31; AR at 45.] Additionally, according to the ALJ, the only other evidence of treatment is from plaintiff's local clinic, "where he only receives occasional routine treatment for general health maintenance purposes." [AR at 31-32.]

Plaintiff explained at the hearing that in 2013 he took the lump sum workers' compensation settlement on advice of his attorney, and used it to help out his family, and purchase a car. [AR at 55-56.] One year after the settlement, because of his "bad decisions with the money," he started living in shelters. [AR at 56, 57.] He stated that at the time he took the settlement he was young and "just kind of anxious," and that now he feels like he "should have took [sic] the long-term medical" instead. [AR at 57.] Plaintiff further argues that he receives treatment at South Bay Family Health Care and was seen for back pain in 2015. [JS at 22 (citing AR at 512 (May 28, 2015, office visit)); see also AR at 516 (describing back pain at February 19, 2015, office visit).] Additionally, he contends that his lack of ability to afford and obtain better treatment is not a valid reason to discount his testimony. [JS at 22 (citation omitted).] Indeed, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." Trevizo, 871 F.3d at 681 (quoting Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995)); Regennitter v. Comm'r Soc. Sec. Admin., 166 F.3d 1294, 1297 (9th Cir. 1999). In this case, the record clearly establishes that plaintiff, who is homeless and receives general relief payments, is unable to afford regular health care treatment, let alone treatment from an orthopedic specialist. It also is reasonable to assume that because plaintiff took the lump sum settlement in lieu of long-term medical care in his workers' compensation action, his treatment by the workers' compensation providers may have been terminated in 2013 when he took the settlement, and explain why there was no further treatment for his back pain or psychological impairments after late 2013.

The ALJ also observed that "the only other evidence of physical treatment is from [plaintiff's]

local clinic, where he only receives occasional routine treatment for general health maintenance purposes." [AR at 31-31.] However, he also noted that a progress note in May 2015 reflected "a visit for low back pain," and that although a second note dated February 19, 2015, mentioned plaintiff's back pain, "this was notably only for a routine physical examination." [AR at 30, 31 (citing AR at 721-46).] The ALJ's characterization of the record is not entirely accurate. In fact, the February 19, 2015, note, although it may have been generated following a physical examination, noted plaintiff's history of back pain and, on clinical examination, found that there was tenderness of the lumbar spine, moderately reduced lumbar range of motion, and that plaintiff was only able to bend less than 90 degrees. [AR at 518.]

Based on the foregoing, this was not a specific, clear and convincing argument for discounting plaintiff's testimony.

### 2.     Vague and Inconclusive Reports

The ALJ also discounted plaintiff's testimony because the opinions from various workers' compensation orthopedists and other examiners were "somewhat vague and inconclusive, and did not give any permanent limitations or restrictions regarding his spinal condition." [JS at 31.]

The ALJ's summary of the medical evidence belies this assertion. For instance, he points to a December 2010 report from John Foster, M.D., that showed moderate tenderness, limited range of motion, and positive straight leg raising on examination, and opined that plaintiff "should not perform any lifting, pushing or pulling over 10 pounds." [AR at 29; see also AR at 228.] The ALJ notes that a subsequent MRI showed disc protrusions at L4-L5 and L5-S1, with mild to severe stenosis, and a later evaluation by Dr. Foster showed persistent radiating low back pain exacerbated by lifting, bending, pushing, or pulling, and diagnosed plaintiff with disc herniation in the lumbar spine with radiculopathy. [AR at 29 (citations omitted).] A review of the MRI report reflects that the disc protrusions at both L5-S1 and at L4-L5 were coming in contact with the S1 and L4 nerve roots, respectively. The ALJ does not explain what is "vague and inconclusive" about this report and, indeed, the Court does not see anything vague or inconclusive about any of Dr. Foster's findings, his recommendation regarding limited lifting, pushing or pulling, or the MRI

report.

The ALJ also noted that on March 28, 2011, plaintiff underwent a right-sided ganglion block at C6 due to a diagnosis of chronic regional pain syndrome/reflex sympathetic dystrophy, and on the same day also underwent a lumber epidural steroid block at L4-L5 and L5-S1.  [AR at 29 (citations omitted).]  On February 9, 2011, AME orthopedic surgeon, William Mouradian, M.D., examined plaintiff and found spasms, tenderness, and a markedly limited range of motion in the back.  [AR at 29-30.]  He also determined that plaintiff was temporarily totally disabled, and on March 12, 2012, he stated that plaintiff would not be permanent and stationary under the workers' compensation guidelines for up to two years.  [AR at 29-30 (citations omitted).]  As with Dr. Foster's findings, the ALJ does not explain what is "vague and inconclusive" about this report and, indeed, the Court does not see anything vague or inconclusive about Dr. Mouradian's clinical findings or conclusions.

The ALJ also points to reports from orthopedic surgeon Mark Ganjianpour, M.D., from February 2012 through November 2013, that indicated diagnoses of lumbar spine disc protrusions. [AR at 30 (citations omitted).]  The ALJ also commented that the most recent report on October 11, 2013, stated plaintiff "was doing fairly well" and was managing his pain with home exercise. [AR at 30 (citations omitted).]  The ALJ found it "notable" that the examination "showed no evidence of radiculopathy."  [Id.]  Dr. Ganjianpour, however, found that on physical examination plaintiff had "some stiffness of the lumbar spine," but that his "radiculopathy is not noted on exam today."  [AR at 743 (emphasis added).]  He did not suggest that plaintiff's radiculopathy was thereby "cured" or might not be apparent at another time; he also declined to comment on plaintiff's work status, and deferred "all factors of disability to Dr. Mouradian at this point," as plaintiff's AME physician.  [AR at 744.]  As with Dr. Foster's and Dr. Mouradian's findings, the ALJ does not explain what is "vague and inconclusive" about this report and, indeed, the Court does not see anything vague or inconclusive about Dr. Ganjianpour's findings.

The ALJ also noted that the October 16, 2014, evaluation by consultative internal medicine examiner Marvin Perer, M.D., which the ALJ gave "great weight," reflected a limited range of motion in the lumbar spine with positive straight leg raising results.  [AR at 30 (citing AR at 505-

09).] The ALJ commented, however, on Dr. Perer's additional findings that plaintiff had no deficits in motor functioning, sensation, or reflexes and had a normal gait, and noted that Dr. Perer concluded plaintiff could perform light work not involving more than frequent kneeling, crouching, or stooping. [AR at 30 (citing AR at 505-09).] However, Dr. Perer's report also noted that plaintiff's December 9, 2010, MRI reflected an L4-L5 disc protrusion, that comes into contact with the L5 nerve root; stated that the lumbar range of motion "is limited and painful to 20 degrees flexion and 25 degrees extension"; and reflected that the straight-leg raising test was "positive in the sitting and supine positions." [AR at 505.] Indeed, it is only *this* consultative report -- in which Dr. Perer found plaintiff capable of light work and frequent postural activities -- that appears to be inconsistent with Dr. Perer's own general examination of plaintiff, his discussion of the clinical MRI findings, and with the opinions of Drs. Foster, Mouradian, and Ganjianpour.

This was not a specific, clear and convincing argument for discounting plaintiff's testimony.

### 3. Conservative Treatment

The ALJ found it "notable" that plaintiff "has never undergone back surgery, nor has surgery been recommended over more conservative treatment." [AR at 31.] He noted that plaintiff's back condition is primarily treated with ibuprofen and medical marijuana as his stomach becomes upset by other anti-inflammatory medications. [Id.] The ALJ also noted that Dr. Mouradian "expressly concluded" that plaintiff should not have back surgery after reviewing plaintiff's MRI. [Id. (citing AR at 677).] A review of Dr. Mouradian's records, however, reflects that the ALJ's statements again are not entirely accurate.

Dr. Mouradian's March 12, 2012, report reflects the following history:

- on February 9, 2011, Dr. Mouradian diagnosed plaintiff with a disk herniation based on the December 9, 2010, MRI and found him to be temporarily totally disabled; at that time he recommended epidural injections and "stated that the patient was very young with a two-level involvement and every effort must be made to avoid surgery"; he also explained to plaintiff that "he might need surgery, but at that time, surgery was not indicated, and the plan should be epidural injections and observation";

- Dr. Mouradian re-evaluated plaintiff on September 12, 2011, and learned the following: the two epidural injections administered to plaintiff provided only temporary relief and, because plaintiff was depressed, Dr. Ganjianpour had sent him to a psychologist; Dr. Mouradian again found that plaintiff remained temporarily totally disabled; he also noted that plaintiff had "some response to conservative treatment," and stated that "[b]ecause of his young age, . . . surgery must be avoided if at all possible"; he recommended an updated MRI and noted that "if a new MRI showed no progression or even regression, then he would probably be MMI"[12];

- on October 24, 2011, after reviewing a September 27, 2011, MRI, Dr. Mouradian authored a supplemental report, and gave more specific diagnoses of lumber disc herniation, noted regression of the herniations at L4-L5 and L5-S1, and again concluded that plaintiff remained temporarily totally disabled;

- at Dr. Mouradian's March 12, 2012, examination, plaintiff reported that he was the same as the last time he had been seen by Dr. Mouradian; at that time, plaintiff was also seeing Dr. Deardorff, and had also seen Dr. Armstrong; Dr. Mouradian noted that if (as reported by plaintiff's counsel at the time) Dr. Armstrong had recommended plaintiff have access to continued psychological care and psychotropic medications, then those requests should be "honored"; Dr. Mouradian concluded that plaintiff remained temporarily totally disabled and he expected it might be two years before he would be "permanent and stationary"; he also further noted that he had "reviewed [plaintiff's] MRI, and again concluded that he should not have surgery."

[AR at 441-56.]

Thus, it appears that Dr. Mouradian did not ever "expressly conclude" that plaintiff should *never* have back surgery -- only that given his young age, and possibly because the herniations

---

[12] Under California law, MMI (also referred to as permanent and stationary status) refers to maximal medical improvement -- the point where an injured worker's medical condition has stabilized and is unlikely to change within the next year, with or without medical treatment. Cal. Code Regs. tit. 8, § 9785.

had regressed some, it would not be appropriate at this time.

Additionally, the ALJ's statement that plaintiff's pain is treated only with ibuprofen and marijuana also is not entirely accurate. Dr. Ganjianpour's 2013 records reflect that plaintiff was being prescribed an opiod-based pain killer and a muscle relaxant at that time and, therefore, at least for some portion of time -- before his workers' compensation medical care was terminated -- plaintiff was not just treating his pain with ibuprofen and marijuana as suggested by the ALJ. [AR at 744 (refilling plaintiff's prescriptions for Vicoprofen and Flexeril).] Additionally, as previously discussed, plaintiff underwent two epidural injections and a ganglion block, which were not effective in relieving his pain for any period of time. This was not conservative treatment. See, e.g., Garrison, 759 F.3d 995, 1015 n.20 (expressing "doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment"); Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010) (criticizing an ALJ for discounting the claimant's testimony based on the ALJ's characterization of the claimant's treatment as "conservative" where the treatment included "copious amounts of narcotic pain medication as well as occipital nerve blocks and trigger point injections," as well as cervical fusion surgery); Yang v. Barnhart, 2006 WL 3694857, at *4 (C.D. Cal. Dec. 12, 2006) (ALJ's finding that claimant received conservative treatment was not supported by substantial evidence when claimant underwent physical therapy and epidural injections, and was treated with several pain medications); Christie v. Astrue, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize treatment with narcotics, steroid injections, trigger point injections, and epidural injections as conservative).

This was not a specific, clear and convincing argument for discounting plaintiff's testimony.


### 4.     Conclusion

Based on the foregoing, the ALJ's subjective symptom testimony determination was not "sufficiently specific" to allow this Court to conclude that the ALJ rejected plaintiff's testimony on permissible grounds and did not arbitrarily discredit his testimony regarding pain. Brown-Hunter, 806 F.3d at 493 (quoting Bunnell, 947 F.2d at 345-46). Remand is warranted on this issue.

# VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. <u>Trevizo</u>, 871 F.3d at 682 (citation omitted). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. <u>Id.</u> (citing <u>Garrison</u>, 759 F.3d at 1019). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. <u>See</u> <u>Garrison</u>, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, because the ALJ failed to provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting plaintiff's subjective symptom testimony, the ALJ on remand, in accordance with SSR 16-3p, shall reassess plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony. Second, because the ALJ failed to provide specific and legitimate reasons for discounting the opinion of Dr. Armstrong regarding plaintiff's mental health impairments, the ALJ shall reassess the medical evidence of record relating to the severity of plaintiff's mental health impairments, including, if applicable, any testimony offered by plaintiff as to those impairments. The ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects. Based on his reassessment of plaintiff's subjective symptom testimony, as well as the evidence of record relating to plaintiff's mental health impairments, the ALJ at step two shall reassess the severity of plaintiff's mental health impairments. Third, because he is reassessing plaintiff's subjective symptom testimony, the ALJ on remand shall also reassess all of the medical opinions of record, regarding plaintiff's physical impairments. The ALJ must explain the weight afforded to each opinion and provide

legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects. Finally, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[13]

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  August 21, 2018

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[13]  Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to his past relevant work.